# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

———————————————————————————

IN RE:
ANGELO DIVITTORIO,
          DEBTOR.

Chapter 13
Case No. 05-20854-WCH

———————————————————————————

ANGELO DIVITTORIO,
          PLAINTIFF,

v.

HSBC BANK, USA, N.A., AS TRUSTEE ON
BEHALF OF ACE SECURITIES CORP. HOME
EQUITY LOAN TRUST AND FOR THE
REGISTERED HOLDERS OF ACE SECURITIES
CORP. HOME EQUITY LOAN TRUST, SERIES
2006-SD1, ASSET BACKED PASS-THROUGH
CERTIFICATES, OCWEN LOAN SERVICING,
LLC, AND INDYMAC FEDERAL BANK,
          DEFENDANTS.

Adversary Proceeding
No. 09-1089

———————————————————————————

## MEMORANDUM OF DECISION

## I. INTRODUCTION

The matters before the Court are HSBC Bank's Motion to Dismiss (the "Motion to Dismiss")

filed by the Defendant HSBC Bank, USA, N.A.[1] (the "Defendant"), the Plaintiff-Debtor's

Opposition to Motion to Dismiss of HSBC Bank (the "Opposition") filed by Angelo DiVittorio (the

"Debtor"), and the Debtor's Motion to Extend Stay of Foreclosure (the "Stay Motion"). Through the

---

[1] As Trustee on behalf of ACE Securities Corp. Home Equity Loan Trust and for registered holders of ACE Securities Corp. Home Equity Loan Trust, Series 2006-SD1, Asset Backed Pass-Through Certificates.

1

Complaint, the Debtor alleges violations of the Massachusetts Consumer Credit Cost Disclosure Act

("CCCDA"),[2] the Massachusetts analog to the federal Truth in Lending Act ("TILA"),[3] and seeks

a declaration that he validly rescinded a refinancing transaction and an award of statutory damages

and costs for the Defendant's refusal to acknowledge the rescission.   Additionally, the Debtor

requests that I continue to stay the foreclosure sale of the subject property until the resolution of this

adversary proceeding.  In support of the Motion to Dismiss, the Defendant contends that the Debtor's

claims are untimely and otherwise fail to state a claim upon which relief can be granted.   For the

reasons set forth below, I will grant the Motion to Dismiss and deny the Stay Motion.

## II. BACKGROUND

### A. The Procedural History

To place the present dispute in context, the Debtor filed a voluntary Chapter 13 petition on

October 11, 2005.  On February 5, 2009, at the suggestion of Debtor's counsel, I granted Ocwen

Loan Servicing, LLC ("Ocwen"), as servicer for the Defendant, relief from stay to foreclose 39-41

Bonner Avenue, Medford, Massachusetts (the "Property") effective March 27, 2009.[4]  On February

13, 2009, however, the Debtor, through new counsel, filed a motion seeking to vacate my order

granting relief from stay (the "Motion to Alter Order") on the basis that the Debtor rescinded the

loan.[5]  Ocwen filed an opposition, and on March 10, 2009, the Debtor filed the above-captioned

---

[2] Mass. Gen. Laws ch. 140D, § 1 *et seq*.

[3] 15 U.S.C. § 1601 *et seq*.

[4] At the hearing, Debtor's counsel offered no defense to Ocwen's motion for relief from
stay, but suggested that relief enter in thirty days to afford the Debtor an opportunity to pursue a
loan modification with the lender.

[5] Complaint, Docket No. 1 at ¶ 34.

adversary proceeding asserting novel theories in support of his claim of rescission under the CCCDA.[6]

On March 12, 2009, I held a hearing on the Motion to Alter Order.  After hearing from both parties, I declined to vacate my order, but stayed the foreclosure ninety days to determine the validity of the Debtor's purported rescission through the adversary proceeding on the condition that he pay the mortgagee $2,000 per month on the first day of each month as adequate protection.  The Defendant moved to dismiss the adversary proceeding on April 28, 2009, and the Debtor filed an opposition on May 21, 2009.  On May 22, 2009, the Debtor filed the Stay Motion in the lead case seeking a further extension of my March 12, 2009 order.  On May 28, 2009, I conducted a hearing on the Motion to Dismiss, and at its conclusion, took the matter under advisement.  Both parties subsequently filed supplemental briefs, and I consolidated the consideration of the Stay Motion with the Motion to Dismiss.

B. Defining the Record and Standard of Review

In *Ashcroft v. Iqbal*, the Supreme Court of the United States recently explained the standard for dismissal under Fed. R. Civ. P. 12(b)(6), made applicable in adversary proceedings by Fed. R. Bankr. P. 7012(b):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are "merely consistent with" a defendant's

---

[6] Both Ocwen and the Federal Deposit Insurance Corporation, as receiver for IndyMac Bank, FSB, were dismissed from this adversary proceeding with the assent of the Debtor prior to this matter being taken under advisement.

3

liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" . . .

Two working principles underlie our decision in Twombly. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.[7]

"In deciding a motion to dismiss, however, a court is not always limited to the facts alleged in the plaintiff's complaint."[8]  The court must also consider "facts extractable from the documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice."[9]  "In other words, in cases where 'a complaint's factual allegations are expressly linked to--and admittedly dependent upon--a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).'"[10]  It is well established that a court may look to matters of public record, including its own docket.[11]

In the present case, the Debtor attached a copy of a Truth in Lending Disclosure Statement (the "TIL Disclosure") and a three page document titled "Adjustable Rate Mortgage Loan Program Disclosure Non-Convertible 2/6 LIBOR Performance ARM" (the "ARM Disclosure") to the

---

[7] *Ashcroft v. Iqbal*, – U.S. –, 129 S.Ct. 1937, 1949-1950, 173 L.Ed2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-570 (2007)) (citations omitted).

[8] *Rederford v. U.S. Airways, Inc.*, 586 F.Supp.2d 47, 50 (D.R.I. 2008).

[9] *Jorge v. Rumsfeld*, 404 F.3d 556, 559 (1st Cir. 2005).

[10] *Machado v. Sanjurjo*, 559 F.Supp.2d 167, 171-172 (D.P.R. 2008) (*quoting Beddall v. State St. Bank and Trust Co.*, 137 F.3d 12, 17 (1st Cir.1998)).

[11] *See, e.g., Boateng v. InterAmerican Univ.*, 210 F.3d 56, 60 (1st Cir. 2000); *In re Marrama*, 345 B.R. 458, 464 (Bankr. D. Mass. 2006); *In re Hyde*, 334 B.R. 506, 508 n.2 (Bankr. D. Mass 2005).

4

Complaint and therefore these documents are appropriately considered.[12]  Although both sides

reference other loan documents, most notably, an amendment to the ARM Disclosure, none were

submitted in connection with the Motion to Dismiss.[13]  Copies of the Fixed/Adjustable Rate Note

and Mortgage (the "Note and Mortgage"), however, are attached to both Ocwen's motion for relief

from stay and proof of claim.[14]  Though somewhat procedurally attenuated, both of these documents

are relevant to the relief the Debtor seeks, particularly in light of the defensive nature of the Debtor's

claims.  Moreover, the docket in the lead case reflects that the Debtor never challenged the

authenticity of the Note and Mortgage despite ample opportunity.  Accordingly, I find that the Debtor

incorporated the Note and Mortgage by reference in his Complaint, enabling me to consider them

at this time without converting the Motion to Dismiss to one for summary judgment under Fed. R.

Civ. P. 56(c).[15]

C. The Debtor's Allegations

The following facts are drawn from the Debtor's Complaint, which I must accept as true for

purposes of the Motion to Dismiss, as well as the various loan documents before me.[16]  The Debtor

and his brother, Joseph DiVittorio (collectively, the "DiVittorios"), have resided at the Property since

---

[12] Complaint, Docket No. 1 at Exs. A, B.

[13] *See, e.g., Id.* at ¶ 18 n.2.

[14] Motion filed by Creditor Ocwen Loan Servicing, LLC for Relief from Stay Re: 39-41 Bonner Avenue, Medford, MA 02155 ("MRS"), Docket No. 157, Case No. 05-20854-WCH; Claim No. 1-1, Case No. 05-20854-WCH.

[15] Made applicable to adversary proceedings by Fed. R. Bankr. P. 7056.

[16] *Twombly*, 550 U.S. at 555.

1970.[17]  After inheriting it from their parents, the DiVittorios refinanced the Property thirteen times

between 1998 and 2003.[18]  On March 13, 2003, the DiVittorios closed the present loan transaction

in the original amount of $330,000 by executing the Note and granting a first mortgage to IndyMac

Bank, FSB, ("IndyMac").[19]  The obligation under the Note and Mortgage was incurred primarily for

personal, family, or household purposes.[20]  Although the IndyMac loan was an "income-stated loan,"

the Debtor contends that prior to the closing, IndyMac obtained the Debtor's credit report and

information regarding the timeliness of his payments under his prior mortgages.[21]  The Defendant

purports to be the current holder of the Mortgage.[22]

As previously stated, the closing took place on March 13, 2003, at which time the Debtor

received the TIL Disclosure.[23]  I note that the form of the TIL Disclosure is substantially similar to

the model form provided in the appendix to Regulation Z,[24] TILA's enabling regulations

promulgated by the Federal Reserve Board.[25]  The TIL Disclosure indicated, *inter alia*, an annual

percentage rate of 7.365%, a finance charge in the amount of $465,335.47, an amount financed of

---

[17] Complaint, Docket No. 1 at ¶¶ 3-4.

[18] *Id.* at ¶ 10.

[19] *Id.* at ¶¶ 5, 8, 10.

[20] *Id.* at ¶ 6.

[21] *Id.* at ¶ 11.

[22] *Id* at ¶ 5.

[23] *Id.* at ¶ 12; *see* Ex. A.

[24] 12 C.F.R. § 226.1 *et seq.*

[25] 12 C.F.R. Pt. 226, App. H; *see also* 209 C.M.R. 32.28(5) (incorporating appendix H of
Regulation Z by reference).

$321,306.08, and a total of all payments in the amount of $786,641.55.[26]  The middle section of the

TIL Disclosure set forth the following repayment schedule:[27]

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 24 | 2,596.11 | 05/01/2003 |
| 335 | 2,155.75 | 05/01/2005 |
| 1 | 2,158.66 | 04/01/2033 |

Notably, the words "monthly" or "beginning on" are conspicuously absent from the repayment

schedule.

The TIL Disclosure further reflected that the loan contained a "variable rate feature" and

referred the Debtor to a separate disclosure regarding the variable rate.[28]  Moreover, it disclosed that

a late charge of 3.00% of the overdue payment would be imposed on any payment not received by

the end of fifteen days after the date it was due.[29]  Additionally, the TIL Disclosure contained a

separate statement instructing the Debtor to "[s]ee [his] *contract documents for any additional*

*information about non-payment, default*, any required payment in full before the scheduled date, and

any prepayment refunds."[30]

On that same date, the Debtor received the "ARM Disclosure.[31]  Generally, I note much of

the language used in the ARM Disclosure appears to have been taken from the model clauses

---

[26] Complaint, Docket No. 1 at Ex. A.

[27] *Id.*

[28] *Id.* at ¶ 15.

[29] *Id.* at Ex. A.

[30] *Id.* (emphasis added).

[31] *Id.* at Ex. B.

provided in the appendix to Regulation Z.[32]  I also note that the ARM Disclosure appears to be a generic disclosure form for this type of loan product, without mention of the Debtor's loan or its specific terms.  That being said, the ARM Disclosure explained that the interest rate would be determined as follows:

> Your Interest Rate will be based on an index rate plus a margin, rounded to the nearest .125% (the "Interest Rate"), unless your Caps limit the amount of change in the Interest Rate.  The "Margin" is the amount which will be added to the index to determine your Interest Rate.  *The Margin <u>may</u> be reduced by .50% for credit levels I+, I, and II as shown in the examples below; and, by 1.00% for credit levels III and IV after the second year of the loan if all payments for the first two years of the loan are paid on time.*  If the Margin is reduced after the second year of the loan, the Margin will not change through the remaining term of the loan.  Please ask us for our current Interest Rates and Margins.[33]

As emphasized above, the interest rate was subject to a performance based rate reduction feature (the "Reduction Feature") by which the Debtor would qualify for a reduced margin if he made the first two years of payments timely.  Neither the ARM Disclosure nor the TIL Disclosure, however, indicated the Debtor's "credit level" or the potential margin reduction he would receive pursuant to the Reduction Feature.[34]

In the Complaint, the Debtor notes that the Reduction Feature was subsequently altered by another document such that "[t]he amendment ultimately used for the note required that the first 22 payments be made within 30 days 'of the due date,' while the Adjustable Rate Disclosure referred to payment during the 'first two years' having to be made 'on time'. . . ."[35]  Although the Debtor did

---

[32] *See* 12 C.F.R. Pt. 226, App. H

[33] *Id.* (italics and underline added).

[34] *Id.* at ¶ 17.

[35] *Id.* at ¶ 18 n.2.

8

not attach this "amendment" to the Complaint, I have identified two documents incorporated into

the Note and Mortgage and signed by the Debtor that have this effect.  One is the Addendum to

Fixed/Adjustable Rate Note (the "Addendum") and the other is the Rider to Security Instrument and

Fixed/Adjustable Rate Rider (the "Adjustable Rate Rider").[36]  Both the Addendum and Adjustable

Rate Rider contain the following nearly identical language:

> Section 4(C), Calculation of Charges, of the Fixed/Adjustable Rate [Note/Rider] is
> modified to provide that, if Borrower makes each of the first 22 payments within 30
> days of the due date, as set forth in Section 3 of the Fixed/Adjustable Rate Note, the
> percentage points to be added to the Current Index as referred to in Section 4(c) of
> the Fixed/Adjustable Rate [Note/Rider] *shall be reduced by .500%.*[37]

Compared to the ARM Disclosure, this language in the Addendum and the Adjustable Rate Rider

clarified that the Debtor was entitled to a .500% margin reduction after making the first twenty-two

payments.  I further note that this language appears in approximately twelve point font and is one

of only three fairly short paragraphs on each page.[38]

Additionally, neither the TIL Disclosure nor the ARM Disclosure specifically stated whether

the initial interest rate of the loan would be a discounted or premium rate.[39]  With respect to this

issue, however, the ARM Disclosure only stated the following:

> Your initial Interest Rate will not be equal to an index rate plus a margin.  If the
> initial Interest Rate is below the then-current index plus Margin (the "fully-indexed
> rate"), then the initial Interest Rate will be a "Discounted" interest rate.  If the initial
> Interest Rate is above the then-current fully-indexed Interest rate, then the initial
> Interest Rate will be a "Premium" Interest Rate.  Please ask us about the current

---

[36] MRS, Docket No. 157 at Ex. A p5, Ex. B p17.

[37] *Id.* (emphasis added).

[38] *Id.*

[39] Complaint, Docket No. 1 at ¶ 29.

Discount or Premium.[40]

At the time the ARM Disclosure was provided to the Debtor, the initial interest rate had been set and was a premium rate.[41]  This is evident from the TIL Disclosure, in which the initial twenty-four payments are approximately $440 more than the three hundred and thirty-six that follow.[42]

According to the Complaint, IndyMac utilized the reduced rate the Debtor would have been entitled to under the Reduction Feature, thereby assuming he would make the first twenty-two payments timely, to compute the APR on the TIL Disclosure.[43]  The TIL Disclosure, however, did not reflect this assumption on its face as the basis for its APR calculation.[44]  Nonetheless, failure to make the first twenty-two payments timely would result in an additional interest payment of approximately $100 per month for twenty-eight years and over $30,000 in additional finance charges.[45]

By a letter dated February 11, 2009, addressed to the Defendant, Ocwen, and IndyMac, the Debtor purported to rescind the loan and requested an accounting, almost six years after the closing of the refinancing.[46]  The Defendant disputed the validity of the Debtor's exercise of rescission.[47]

---

[40] *Id.* at Ex. B.

[41] *Id.* at ¶ 30.

[42] *Id.* at Ex. A.

[43] *Id.* at ¶ 18.

[44] *Id.* at ¶ 19.

[45] *Id.* at ¶ 22.

[46] *Id.* at ¶ 34.

[47] *Id.* at ¶ 35.

10

D. <u>The Alleged CCCDA Violations</u>

The Debtor advances four novel theories in support of his claim for rescission and damages under the CCCDA.[48]  First, he alleges that by "predicting the projected interest rate (at the time of the loan's first rate adjustment) on the presumed occurrence of a series of future acts – the computation of the blended rate for the adjustable loan resulted in an APR that was itself understated by more than 1/8th percent."[49]  Put simply, he challenges the numerical accuracy of the APR stated on the TIL Disclosure because he had not yet made twenty-two timely payments on the date of consummation and was therefore not entitled to a margin reduction under the Reduction Feature. Second, the Debtor also asserts that the APR was not clearly and conspicuously disclosed because the TIL Disclosure failed to reflect that the APR was calculated assuming that the Debtor would ultimately receive a reduced margin under the Reduction Feature.  Third, he similarly contends that the existence of an initial premium rate was not clearly and conspicuously disclosed on either the TIL Disclosure or the ARM Disclosure.  Fourth, the Debtor asserts that the failure to specify a payment period in the repayment schedule provided on the TIL Disclosure constitutes a material non-disclosure.  He contends that each of these violations gave rise to his right of rescission and that the Defendant's refusal to accede entitles him to statutory damages and costs under the CCCDA.

---

[48] The Complaint consists of only a single cause of action, namely, a violation of the CCCDA, but the Debtor advances several theories in support.  While he specifically identifies three separate theories, I discern two distinct theories in the Complaint and subsequent briefs regarding the adequacy of the APR disclosure.

[49] Complaint, Docket No. 1 at ¶ 21.

### III. <u>POSITIONS OF THE PARTIES</u>

<u>The Defendant</u>

As a threshold matter, the Defendant first argues that the Debtor's claims for rescission and damages are time-barred by CCCDA's four year statute of repose because consummation of the transaction took place more than four years ago.[50]  The Defendant concedes that my decision in *In re Fidler*[51] permits a debtor to assert a claim for rescission defensively outside the four year statutory period, but argues that the adversary proceeding is affirmative in nature and recoupment was not pled.  Even assuming, *arguendo*, that the claims were timely, the Defendant argues that they are not legally sustainable.

The Defendant characterizes the Debtor's theories regarding the APR as an "illogical twisting of the statute" because all TIL disclosures assume timely payments as it "would be difficult to imagine how an originating lender could make any coherent disclosure if it had to build in the possibility and timing of a borrower defaulting."  Under the Debtor's theory, the Defendant argues that a lender would have to anticipate a borrower failing to make even the first payment timely, a scenario it describes as an admission of fraud by the borrower.  Moreover, the Defendant asserts that the statute expressly provides that if an accurate disclosure is rendered inaccurate by a subsequent act or occurrence, it will not constitute a violation of the CCCDA.[52]

The Defendant also contends that the Debtor's efforts to label the Reduction Feature as an undisclosed late charge, as discussed below, fails because the Reduction Feature does not apply to

---

[50] *See* Mass. Gen. Laws ch. 140D, § 10.

[51] *Fidler v. Cent. Coop. Bank (In re Fidler)*, 226 B.R. 734 (Bankr. D. Mass. 1998).

[52] Mass. Gen. Laws ch. 140D, § 9.  *See also* 15 U.S.C. § 1634.

12

"individual delinquent installments" or contemplate the transaction continuing "on its original terms."[53]  In fact, the Defendant notes the Debtor admitted, both at the May 29, 2009 hearing and in the Debtor's supplemental brief, that the possibility of an increase in the contract rate of interest due to a default would not normally have to be factored into the initial APR and finance charge disclosure.  In any event, the Defendant asserts that the omission of the Reduction Feature from the TIL Disclosure is not a "material disclosure" which would give rise to a right of rescission.

Next, the Defendant contends that the Debtor's premium rate disclosure theory is an improper attempt to write a new provision into the CCCDA.  The Defendant notes that the Debtor was provided with his actual initial rate in the Note, and therefore argues that the information was disclosed in the most understandable method possible.  As such, the disclosure satisfied the statute and is not a basis for rescission.

Finally, relying on *Palmer v. Champion Mortgage*,[54] the Defendant argues that the omission of the word "monthly" from the TIL Disclosure is inconsequential under an objective standard.  The Defendant contends that any average person viewing the TIL Disclosure would understand that the payments would be due on a monthly basis based upon the number of payments corresponding to each due date spanning a period of thirty years.  Moreover, the Defendant asserts that the Debtor's reliance on *Hamm v. Ameriquest Mortgage Co.*[55] is misplaced, as the United States Court of Appeals for the Seventh Circuit noted in that decision that the United States Court of Appeals for the First Circuit does not apply a "hyper-technical" standard.

---

[53] 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. 226.18(f); *see* 209 C.M.R. § 32.18(12).

[54] *Palmer v. Champion Mortgage*, 465 F.3d 24 (1st Cir. 2006)

[55] *Hamm v. Ameriquest Mortgage Co.*, 506 F.3d 525, 531 (7th Cir. 2007)

13

<u>The Debtor</u>

Relying on *In re Fidler* for the proposition that rescission may be asserted defensively by way of recoupment past the four year statute of limitations, the Debtor submits that his rescission claim is asserted as an offset to the Defendant's foreclosure claim.  To the extent that the Debtor seeks damages for the Defendant's failure to rescind the transaction, he argues that the statute of limitations for this type of violation does not begin to run until the holder of the mortgage receives the notice of rescission.[56]

Turning to his substantive arguments, the Debtor contends that the APR is numerically inaccurate because it was calculated in violation of the Federal Reserve Board's prescription that the remaining term on a loan using either an initial discount or premium rate should be based on "the rate that would have been applied using the index or formula at the time of consummation."[57] Because the APR as disclosed did not reflect conditions as they existed at consummation, namely, a rate not subject to the Reduction Feature, the Debtor argues that it was understated.  After arguing at some length about the statistical unreasonableness of applying such an assumption to a sub-prime loan, the Debtor asserts that permitting an APR calculation to be rooted in anything other than the circumstances as they existed at consummation would allow lenders to exercise "mischievous creativity . . . [to craft] even more fanciful assumptions."[58]  The Debtor also expresses policy

----

[56] *Belini v. Washington Mut. Bank, FA*, 412 F.3d 17 (1st Cir. 2005).

[57] 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. 226.17(c)(1)(10)(i).

[58] Plaintiff-Debtor's Memorandum in Opposition to Motion to Dismiss of HSBC Bank (the "Opposition Brief"), Docket No. 28 at p. 17.  Ironically, the Debtor's theory would seem to support a calculation of the APR based upon the assumption that the Debtor *would not* have made the initial twenty-two payments timely, which would also not have reflected the conditions as they existed at consummation.

14

concerns because the statute and regulations provide safe harbor provisions for subsequent inaccuracies.

Even if the APR is numerically correct, the Debtor argues, it remained misleading and deceptive because the TIL Disclosure failed to clearly and conspicuously disclose: 1) the assumption used in its calculation; 2) a $30,000 late charge, and 3) the APR applicable if the borrower had not qualified for the Reduction Feature.  First, the Debtor asserts that because the effect of a borrower's failure to qualify for the Reduction Feature is substantial and determinable at consummation, it should be recognized by the regulatory scheme.  He then goes on to argue that the increased payments resulting from a borrower's failure to qualify for the Reduction Feature are, in effect, a one time $30,000 late charge that should be conspicuously reflected on the TIL Disclosure.  Moreover, citing Mass. Gen. Laws Ch. 183, § 59, the Debtor questions whether a $30,000 late charge would even be lawful under Massachusetts law.[59]  Further, the Debtor appears to argue that the failure to qualify for the Reduction Feature is not analogous to a default rate of interest, a characterization not used in the loan documents, because there is no opportunity to cure the default.  Although he concedes that the failure to disclose a late charge is not material and does not give rise to right of rescission, the Debtor asserts that it renders the APR and finance charges misleading and inaccurately disclosed.

---

[59] Mass. Gen. Laws ch. 183, § 59 provides in relevant part:

In no event, in assessing a penalty because of the delinquency in making all or any part of a periodic payment under a mortgage note, shall the penalty or late charge exceed 3 per cent of the amount of principal and interest overdue, and in calculating the penalty or late charge, any amount of the periodic payment representing estimated tax payments required by the terms of the mortgage note or deed shall not be included.

Further, the Debtor contends that the APR was not clearly and conspicuously disclosed because the assumption upon which it was based precluded informed comparison between different loan products.  He notes that under this method, two dramatically different loan products could disclose identical APRs.  For example, the APR calculated for a loan product in which the margin was contractually and unconditionally reduced by one half or one percent over a period of time would appear the same as the APR disclosed in this case.  In contrast, other loan products which are substantially similar to the one in this case, but structured such that the assumption is that the borrower would not earn the reduction, would appear, less advantageous on their face.[60]  The Debtor also notes that a similar Fannie Mae fixed rate product which allows a borrower to earn rate reductions after a series of timely payments, discloses the APR as a fixed rate rather than a more attractive composite.

Next, relying on *Pham v. T.J. Financial, Inc.*[61] and *Andrews v. Chevy Chase Bank*,[62] the Debtor argues that the failure to disclose that the initial rate was a premium rate in either the TIL Disclosure or the ARM Disclosure is improper.  He contends that this non-disclosure contributed to an already misleading disclosure of the APR and deprived him of an additional context within which to meaningfully assess the terms of the loan.  The Debtor notes, however, that even had he been informed that the initial rate was a premium rate, he would not have known whether the margin would have been further reduced by his timely payments without a disclosure of the assumption upon

---

[60] *See, e.g., Alicea v. Citifinancial Services, Inc.*, 210 F.Supp.2d 4 (D. Mass. 2002).

[61] *Pham v. T.J. Financial, Inc*, No. CV 08-275 ABC, 2008 WL 3485589 *3 (C.D. Cal. 2008).

[62] *Andrews v. Chevy Chase Bank*, 240 F.R.D. 612, 618-619 (E.D. Wis. 2007) *rev'd*, 545 F.3d 570 (7th Cir. 2008).

16

which the APR was based.

Finally, the Debtor asserts that the omission of the word "monthly" in the repayment schedule set forth in the TIL Disclosure violates the statute's mandate that the disclosure state either the payment due dates or payment period. The Debtor cites *Hamm v. Ameriquest Mortgage Co.*[63] in support of his contention that the express requirement is not satisfied where the period is easily inferred from the number of payments between the first and last payment. While the Seventh Circuit reached this result by applying a hyper-technical standard, the Debtor argues that the First Circuit would also rule based on the straightforward nature of this specific requirement.

## IV. DISCUSSION

### A. TILA and the CCCDA

"Both TILA and CCCDA were enacted 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'"[64] Additionally, "[b]oth acts provide that a borrower whose loan is secured by his principal dwelling and who has been denied the requisite disclosures may rescind the loan transaction."[65] For this reason, the CCCDA is sometimes referred to as the Massachusetts Truth in Lending Act.[66] In Massachusetts, however, credit transaction subject to the CCCDA are

---

[63] *Hamm v. Ameriquest Mortgage Co.*, 506 F.3d 525, 531 (7th Cir. 2007)

[64] *In re Fidler*, 226 B.R. at 736 (*quoting Beach v. Ocwen Federal Bank*, 523 U.S. 410, 412 (1998).

[65] *Id. See* 15 U.S.C. § 1635; Mass. Gen. Laws ch. 140D, § 10.

[66] *Jaaskelainen v. Wells Fargo Bank, N.A. (In re Jaaskelainen)*, 391 B.R. 627, 636 (Bankr. D. Mass. 2008), *aff'd in part, vacated in part, Wells Fargo Bank, N.A. v. Jaaskelainen*, –

exempt from many of the provisions of TILA.[67]   Nevertheless, because the provisions of the two statutes are substantially the same, TILA remains relevant to this inquiry and federal court decisions with respect to TILA are instructive in construing the parallel provisions of the CCCDA.[68]

 1.  Timeliness and Recoupment

The primary difference between TILA and the CCCDA is the time within which actions for either damages or rescission must be commenced.   Under TILA, actions for damages must be brought within one year of the occurrence of the violation, while actions for rescission must be brought within three years.[69]   In contrast, actions under the CCCDA generally must be brought within four years.[70]   In *In re Fidler*, however, I held that an action under the CCCDA, including one

---

B.R. – , 2009 WL 1586702 (D. Mass. May 28, 2009) (finding the bankruptcy court has authority to condition rescission on the debtors' ability to tender).

 [67] The Federal Reserve Board has exempted credit transactions within Massachusetts subject to the CCCDA from chapters two and four of TILA. 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. § 226.29(a) ¶ 4; *see Laudani v. Tribeca Lending Corp. (In re Laudani)*, 401 B.R. 9, 25 n.13 (Bankr. D. Mass. 2009).   Chapter two of TILA includes sections 1631 through 1646.  The displacement of federal law is not absolute, however, and it is well established that borrowers retain at least the ability to file suits in federal court pursuant to 15 U.S.C. § 1640.  *Belini v. Washington Mut. Bank, FA*, 412 F.3d at 20.

 [68] *In re Fidler*, 226 B.R. at 736; *Mayo v. Key Fin. Serv., Inc.*, 424 Mass. 862, 864 (1997). *See also* 209 C.M.R. § 32.27 (compliance with the Federal Reserve Board's Official Staff Commentary, which does not conflict with Mass. Gen. Laws ch. 140D or 209 C.M.R. 32.00 or an advisory opinion of the Commissioner, shall be deemed in compliance with the CCCDA); 209 C.M.R. § 32.28 (incorporating appendices D, E, F, G, H, and J of Regulation Z by reference).

 [69] *See* 15 U.S.C. §§ 1640(e) and 1635(f).

 [70] *See* Mass. Gen. Laws ch. 140D, § 10 ("An obligor's right of rescission shall expire four years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, . . . ."); Mass. Gen. Laws ch. 260, § 5A ("Actions arising on account of violations of any law intended for the protection of consumers . . . inclusive of chapter one hundred and forty D . . . whether for damages, penalties or other relief and brought by any person . . . shall be commenced only within four years next after the cause of action accrues.").

seeking rescission, may be asserted defensively by way of recoupment outside the four year statutory period.[71] "To demonstrate that a claim is being asserted in recoupment, the following elements must be satisfied: '(1) the [CCCDA] violation and the creditor's debt arose from the same transaction, (2) [the claimant] is asserting her claim as a defense, and (3) the 'main action' is timely.'"[72]

In the present case, I find that all elements of recoupment are met. Clearly, both the Defendant's secured claim and the Debtor's CCCDA claim arise from the March 13, 2003 loan transaction. Moreover, the Debtor is asserting his CCCDA claims defensively in response to the Defendant's impending foreclosure of the Property. While the Defendant disputes that this adversary proceeding is defensive in nature because the Debtor did not plead recoupment, it correctly acknowledges this argument places form over substance. Although mention of recoupment is conspicuously absent from the Complaint, it was not filed in a vacuum and the Defendant's collection attempts cannot be ignored. Finally, the "main action" in this litigation, namely, Ocwen's proof of claim and motion for relief from stay, is timely.[73] Therefore, I find that the Debtor's CCCDA claims are timely.

---

[71] *In re Fidler*, 226 B.R. at 737 (reaffirming in part my prior holding in *Fidler v. Cent. Coop. Bank (In re Fidler)*, 210 B.R. 411, 420 (Bankr. D. Mass. 1997)); *cf. Beach v. Ocwen Fed. Bank*, 523 U.S. 410 (1998).

[72] *Id.* (quoting *Smith v. American Financial Systems, Inc. (In re Smith)*, 737 F.2d 1549, 1553 (11th Cir.1984)).

[73] Although the Debtor sought to rescind the transaction after I granted Ocwen relief from stay, I note that the Debtor filed the Motion to Alter Order timely and before relief from stay became effective.

2. The APR

The first issue before me is whether the APR was numerically inaccurate on the date of consummation because the yet un-matured Reduction Feature's reduced margin was factored into the APR's calculation.

The APR is defined as "a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made."[74]  The regulations provide that the APR "shall be determined in accordance with either the actuarial method or the United States Rule method" and further state that "[e]xplanations, equations, and instructions for determining the annual percentage rate in accordance with the actuarial method are set forth in appendix J to Regulation Z."[75]  Generally, appendix J states that the APR "shall be the nominal annual percentage rate determined by multiplying the unit-period rate by the number of unit-periods in a year."  Beyond that, appendix J provides no meaningful guidance on how one might factor in an assumption like the one now before me.

The Debtor contends, however, that the Federal Reserve Board has prescribed the method that should have been employed in this case:

> When creditors use an initial interest rate that is not calculated using the index or formula for later rate adjustments, the disclosures should reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, *for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation.* . . .[76]

---

[74] 209 C.M.R. § 32.22(a)(1).

[75] *Id.*  The Official Staff Commentary explains that both methods come very close to mathematical precision, and differ only in the way they treat unpaid interest as it accrues.  12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. § 226.22(a)(1).

[76] 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. 226.17(c)(1)(10)(I) (emphasis added).

20

There are two problems with the Debtor's argument. First, the above-quoted language did not appear in the Official Staff Commentary to Regulation Z until August 9, 2005, over two years after consummation of the loan. Even assuming, *arguendo*, that this commentary constitutes a directive, the lender could not be held to a standard that did not exist when the loan was originated. Second, the Official Staff Commentary, though persuasive, is no more than a safe harbor for lenders acting in good faith.[77] This means that there is no *per se* rule against calculating the APR in a manner inconsistent with this section of the Official Staff Commentary. Ultimately, I conclude that if a violation of the CCCDA arose from the lender's use of the reduced margin under the Reduction Feature in calculating the APR, it is more likely a matter of disclosure than computation.

The crucial issue then becomes whether the APR as disclosed was misleading in light of the lender's undisclosed assumption regarding the Reduction Feature. The Debtor spills much ink arguing the statistical unreasonableness of assuming that a sub-prime borrower such as the Debtor would make twenty-two timely payments and as such, his argument largely collapses into a tirade against the sub-prime mortgage loans and the availability of loan products with exotic features such as the Reduction Feature. Consistent with this focus, he attempts to characterize the Reduction Feature as an insidious and substantial late charge imposed at the two year anniversary of consummation. Recognizing, however, that an undisclosed late charge is not a material disclosure giving rise to an extended right of rescission, the Debtor bootstraps this theory back to the APR deficiencies. Based on this view, the Debtor contends that the late charge, the timely payment assumption, and an alternate APR not based on the Reduction Feature should have all been reflected

---

[77] *See* 209 C.M.R. § 32.27 (compliance with the Federal Reserve Board's Official Staff Commentary . . . shall be deemed in compliance with the CCCDA).

in the TIL Disclosure.

I disagree for several reasons.  First, it is not unreasonable for a lender to assume that a borrower will make timely payments.  That is no more than what the borrower agrees to do when he signs a note and mortgage.  Second, non-receipt of the margin reduction under the Reduction Feature simply does not fit the definition of a late charge.  The Federal Reserve Board Official Staff Commentary explains that "[12 C.F.R. 226.18(f)] requires a disclosure only if charges are added to individual delinquent installments by a creditor who otherwise considers the transaction on-going on its original terms."[78]  Certainly, no argument could be made that the additional amounts paid as a result of failing to obtain a reduced margin are added to "an individual delinquent installment."  Temporally speaking, a default in the first twenty-two payments would not result in an increase (or loss of reduction) until the twenty-third payment, and that change would then carry on for the life of the loan.[79]  Third, assuming, *arguendo*, that  defaulting on any one of  the first twenty-two payments renders the APR understated, the Complaint lacks any allegation that the Debtor did, in fact, default during that period.  In the absence of such a default, the APR must be taken as stated and the Debtor can only argue that the APR was misleading at the outset.

That all being said, the Debtor's struggle to characterize the effect of the Reduction Feature is understandable, but his focus on *only* the TIL Disclosure and ARM Disclosure is misguided.  Admittedly, there is a clear disconnect between the APR reflected in the TIL Disclosure and the method of determination described in the ARM Disclosure.  Even assuming timely payments, the

---

[78] 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. 226.18(f); *see* 209 C.M.R. § 32.18(12).

[79] As the contingency is recognized in the contract, but not factored into the calculations, it is debatable whether the transaction continues on its original terms.

language of the ARM Disclosure does not reflect that the borrower will receive a margin reduction, but "may" receive one of either .500% or 1.00%, suggesting that the Reduction Feature was contingent on further undisclosed criteria beyond timely payments.[80]   The TIL Disclosure, on the other hand, states an APR based upon a reduced margin under the Reduction Feature, suggesting a certainty that the plain language of the ARM Disclosure belies.  This, however, is not the end of the analysis.

The ARM Disclosure is a generic disclosure form regarding the "Non-Convertible 2/6 LIBOR Performance ARM," and not a specific disclosure of the terms of the Debtor's loan.  For transactions secured by the consumer's principal dwelling, lenders are required to provide "[a] loan program disclosure for each variable-rate program in which the consumer expresses an interest."[81] Nothing in the regulation requires transaction-specific terms to be explained in this disclosure.  This is why indefinite language appears in the ARM Disclosure.  In contrast, both the Addendum and the Adjustable Rate Rider, transaction-specific documents, use the word "shall" and indicate a potential reduction of .500%.  Given the reasonable assumption that the Debtor would make timely payments, these transaction-specific documents are consistent with the APR reflected on the TIL Disclosure and its method of determination described in the generic ARM Disclosure.  I further note that the TIL Disclosure's instruction for the Debtor to "[s]ee [his] contract documents for information about non-payment, [or] default . . . " placed him on notice that other important terms not referenced in the

---

[80] "The Margin *may* be reduced . . . after the second year of the loan if all payments for the first two years of the loan are paid on time."  Docket No. 1 at Ex. B (emphasis added).

[81] 209 C.M.R. § 32.19(2)(b).

23

TIL Disclosure could be found in the Note and Mortgage.[82]   Therefore, I find that the APR was clearly and conspicuously disclosed despite the lender's assumption and that the Debtor has not stated a claim upon which relief can be granted under this theory.

### 3.  Disclosure of the Initial Premium Rate

The Debtor asserts that it was improper for the lender not to disclose the use of an initial premium rate.[83]  There is, however, no such requirement in either CCCDA or TILA.  The regulations for both only require that the use of an initial *discount* rate be disclosed.[84]  Even the cases relied upon by the Debtor refer only to an initial discount rate.[85]  As the lender was not required to disclose the use of an initial premium rate, the Debtor has not stated a claim upon which relief can be granted under this theory.

### 4.  Disclosure of the Payment Period

Pursuant to the CCCDA, a lender must disclose "[t]he number, amounts, and timing of payments scheduled to repay the obligation."[86]  Indeed, "the number and amount of payments, and the due dates or period of payments scheduled to repay the indebtedness" are considered material

---

[82] Complaint, Docket No. 1 at Ex. A.

[83] While the Defendant states that disclosure of the actual initial interest rate is sufficient to put the borrower on notice of an initial premium rate, I note that no document indicating the initial interest rate, such as a promissory note, is before me.

[84] 209 C.M.R. § 32.19(2)(b)(5); 12 C.F.R. § 226.19(b)(2)(v).

[85] *Pham v. T.J. Financial, Inc*, 2008 WL 3485589 at *3; *Andrews v. Chevy Chase Bank*, 240 F.R.D. at 618-619.

[86] 209 C.M.R. § 32.18(7).

24

disclosures, giving rise to an extended right of rescission if not disclosed.[87]   The First Circuit, however, has repeatedly rejected a "hyper-technical" view of TILA as inconsistent with Congress' intention to "provide higher tolerance levels for what it view as honest mistakes in carrying out disclosure obligations, " as evidenced by the 1995 amendments to TILA.[88]   Instead, the First Circuit has adopted an objective standard of clear and conspicuous disclosure.[89]   As such, the present issue is whether an average consumer who "is neither particularly sophisticated nor particularly dense," looking at the TIL Disclosure objectively, would be confused by the repayment schedule.[90]

As previously stated, the TIL Disclosure set forth a repayment schedule with three columns with the following headings: "Number of Payments;" "Amount of Payments;" and "When Payments Are Due."   The repayment schedule then set forth twenty-four payments of $2,596.11 due May 1, 2003, three hundred thirty-five payments of $2,155.75 due May 1, 2005, and one payment of $2,158.66 due April 1, 2033.  As a literal reading is nonsensical, the logical import of the repayment schedule is that each series of payments begins on the date stated.  As the number of payments in each series equals the number of months in between each due date, the average consumer would easily conclude, even in the absence of the word "monthly," that the payment interval is monthly with the due date being the first of each month.   Therefore, I find that the First Circuit would consider the omission of the word "monthly" from the TIL Disclosure to be hyper-technical because it does not affect the average consumer's ability to understand the TIL Disclosure.  Accordingly, the

---

[87] Mass. Gen. Laws ch. 140D, §§ 1, 10.

[88] *Santos-Rodriguez v. Doral Mortgage Corp.*, 485 F.3d 12, 17 n.6 (1st Cir. 2007).

[89] *Palmer v. Champion Mortgage*, 465 F.3d at 28.

[90] *Id.*

25

Debtor has not stated a claim for which relief can be granted under this theory.

      B.  <u>The Stay Motion</u>

The Debtor sought a general extension of my order staying the Defendant's right to foreclose in light of the likely merit of his claims challenging the validity of the Defendant's lien.  Having found that the Debtor failed to state any claim for rescission under the CCCDA, no cause exists to further stay the Defendant's foreclosure.  As such, I will deny the Stay Motion.

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order granting the Motion to Dismiss and denying the Stay Motion.

 

_____
William Hillman
United States Bankruptcy Judge

Dated: July 23, 2009

26